IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

ALYCIA HYSOM                        §
                                    §
VS.                                 §        ACTION NO. 4:21-CV-1171-Y
                                    §
DECATUR INDEPENDENT SCHOOL          §
DISTRICT                            §

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

Pending before the Court is the Motion for Summary Judgment (doc. 26) filed by defendant Decatur Independent School District ("DISD"). After review of the motion, the related briefs, the evidence highlighted therein, and the applicable law, the Court concludes that the motion should be granted.

I.   Factual Background

Plaintiff Alycia Hysom was hired by DISD on July 31, 2020, to work as a special education paraprofessional at Young Elementary School ("Young").  During her brief employment, Hysom worked with special needs students in both general-education and resource classrooms.

As a special-education paraprofessional, Hysom was expected to travel between general-education classrooms to visit her assigned students each day. (Hysom's Original Pet. [doc. 1-8] 3, ¶ 15.) After arriving in a general-education classroom, Hysom would sit next to her assigned student while the general-education teacher gave instructions, "assist[ing them] when needed, making sure they're listening [and] following directions." (DISD's App. [doc. 28] 21.) She assisted her assigned students with instructional exercises,

personal hygiene, and behavior management.  (Hysom's Original Pet. [doc. 1-8] 3, ¶ 16.)  Hysom was responsible for learning her students' special needs, reviewing their individualized education plans ("IEPs") to ensure she was meeting their needs, and implementing her students' IEPs.  (DISD's App. [doc. 28] 23.)  She also assisted special-education students when they came into the resource classroom.  (*Id.* at 21.)  While employed by DISD, Hysom never received any type of warning about being unable to perform her job or for misconduct. (Hysom's App. (doc. 33) 25, ¶ 3.

Shortly after Hysom was hired by DISD, she disclosed to the school nurse at Young that she had "Epilepsy (tonic-clonic/petit mal)."  (Pl.'s App. (doc. 33) 70.)  The nurse gave Hysom a seizure action-plan form, and Hysom completed the form. (Hysom's Original Pet. (doc. 1-8) 4, ¶ 17.)  The nurse then informed the school's principal, Lana Coffman, about Hysom's disability.  Outside of Hysom's presence, they discussed what to do if Hysom had a seizure.  (Hysom's App. (doc. 33) 40.)  Hysom contends that neither of them ever followed up with her as to whether she had any limitations due to her epilepsy or what actions should be taken if she had a seizure on campus.  (*Id.* at 26, ¶ 7.)

Generally, Hysom experienced nocturnal seizures and rarely experienced day-time seizures.  (Hysom's Original Pet. (doc. 1-8) 4, ¶ 20.)  Unfortunately, however, after commencing her employment, Hysom experienced seizures on Young's campus during work hours on August 12, August 14, August 25, September 3, and September 9, 2020. (DISD's App. (doc. 28) 51-53; Hysom's Original Pet. (doc. 1-8) 4-5,

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT - Page 2
TRM/chr

¶¶ 22, 24.) Hysom's seizures typically last for less than one minute. (Hysom's Original Pet. (doc. 1-8) 4, ¶ 21.) During her seizures, Hysom experiences motor symptoms such as muscles in her hands becoming tense and rigid, and her awareness is also affected, which causes her to stare into space during the seizure. (*Id.*) Coffman witnessed many of Hysom's seizures. (DISD's App. (doc. 28) 60.) Hysom was generally required by school officials to go home after having a seizure at Young, despite the fact that she did not want to leave work. (Hysom's App. (doc. 33) at 26, ¶ 8.)

After her first seizure at Young, Hysom met with Coffman and expressed concern that she was at risk of losing her job because of her disability. (*Id.* at ¶ 9.) Coffman told her "not to worry" because DISD "would work with her." (*Id.*) On August 20, Hysom "contacted Coffman to discuss her neurologist's recommended treatment plan . . . and to request medical leave." (*Id.* at ¶ 10.) Coffman again placated Hysom, telling her "to take care of [her]self and to update [Coffman] when [Hysom's] treatment was scheduled." (*Id.* at ¶ 10.) That same day, Hysom emailed DISD's Stephanie Weitner asking "for intermittent leave paperwork because of my epilepsy/seizures." (DISD's App. (doc. 28) 76.) Hysom was informed by return email from Meradith Culpepper, DISD's Director of Human Resources and Federal Programs, that intermittent leave was only permitted through the Family Medical Leave ("FML") program, and that Hysom did not qualify for FML because she had not been employed with DISD for more than one year. (*Id.* at 77.) Culpepper informed Hysom that she could instead apply for Temporary Disability Leave ("TDL") for a block of

time, rather than intermittently, after using her remaining nine days of personal leave. (*Id.*)  Hysom did not apply for TDL. (*Id.* at 26.) Hysom also never asked anyone at DISD for any other kind of accommodation for her disability.  (*Id.)*

On September 11, 2020, after Hysom had four more seizures while on campus, she was called into Coffman's office, where Culpepper also was present. (Hysom's App. (doc. 33) 18.)  Culpepper told Hysom that she had discussed Hysom's epilepsy with Coffman, and they had decided to ask her to resign or she would be terminated "because of [her] condition."  (*Id.*)  Hysom chose to resign, and her resignation was accepted by DISD's Superintendent.  (*Id.* at 77.)

Hysom subsequently filed suit in the 271st Judicial District Court, Wise County, Texas, alleging that DISD violated "the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. § 12101, *et seq.* [("ADA")], . . . and the Texas Labor Code § 21.001, *et seq.* [("TLC")]." (Hysom's Original Pet. (doc. 1-8) 1, ¶ 2.) Hysom asserts a claim for "disability discrimination" under both statutes. (*Id.* at 7, ¶ 40.)  DISD removed the lawsuit to this Court on the grounds of federal-question subject-matter jurisdiction and now seeks summary judgment.

## II.  Summary-Judgment Standard

When the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is appropriate.  Fed. R. Civ. P. 56(a).  "[A dispute] is 'genuine' if it is real and substantial, as

opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citation omitted).  A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To demonstrate that a particular fact cannot be genuinely in dispute, a defendant movant must (a) cite to particular parts of materials in the record (e.g., affidavits, depositions, etc.), or (b) show either that (1) the plaintiff cannot produce admissible evidence to support that particular fact, or (2) if the plaintiff has cited any materials in response, show that those materials do not establish the presence of a genuine dispute as to that fact. Fed. R. Civ. P. 56(c)(1). Although the Court is **required** to consider only the cited materials, it **may** consider other materials in the record. *See* Fed. R. Civ. P. 56(c)(3).  Nevertheless, Rule 56 "does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 825 (1992).  Instead, parties should "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence support[s] their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

In evaluating whether summary judgment is appropriate, the Court "views the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 380 (5th Cir. 2010) (citation

omitted)(internal quotation marks omitted). "After the non-movant has been given the opportunity to raise a genuine factual [dispute], if no reasonable juror could find for the non-movant, summary judgment will be granted." *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## III.  Analysis

A.  Failure to Accommodate

DISD seeks summary judgment to the extent Hysom asserts that it failed to reasonably accommodate her disability.[1]  Disability discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . , unless [the employer] can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C.A. § 12112(b)(5)(West 2013).  The TLC similarly requires employers to provide reasonable accommodations to employees with disabilities.  TEXAS LABOR CODE ANN. § 21.128(a) (West 2015).

---

[1]DISD also contends that Hysom failed to exhaust her administrative remedies regarding her failure-to-accommodate claims.  Hysom counters, however, by presenting a "COMPLAINT FORM" she allegedly submitted to the Texas Workforce Commission "[a]fter being forced to resign" on which she checked the box for "reasonable accommodation" under the "employment harms or actions" section of the form.  (Hysom's App. (doc. 33) 27, ¶ 18; 85-87.)  It is unclear exactly when Hysom submitted this complaint form, and the form specifically states that "submitting this Complaint Form DOES NOT represent filing a formal charge of discrimination." (*Id.* at 87.)  Nevertheless, in light of the Court's decision regarding Hysom's claims, it need not decide whether Hysom appropriately exhausted her failure-to-accommodate claims.

Chapter 21 of the TLC exists to "provide for the execution of the policies embodied in Title I of the Americans with Disabilities Act of 1990 and its subsequent amendments."   *Id.* § 21.001(3). Consequently, "courts apply analogous federal case law when interpreting the TLC." *Westrich-James v. Dallas Morning News, Inc.*, 3:07-CV-1329-Y, 2012 WL 4068982, at *3 (N.D. Tex. Sept. 17, 2012) (Fish, J.) (citing *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001)).

"Employees who require accommodation due to a disability are responsible for requesting a reasonable accommodation."  *Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 791 (5th Cir. 2017); *see also* 29 C.F.R. § 1630.9, App. (2016) ("In general . . . it is the responsibility of the individual with the disability to inform the employer that an accommodation is needed"); *Windham v. Harris Cty.,* 875 F.3d 229, 237 (5th Cir. 2017) (the plaintiff must have "request[ed] an accommodation in 'direct and specific' terms") (quoting *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir. 2001) ("The employee's request must be sufficiently direct and specific, giving notice that she needs a special accommodation.")); *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996) ("Where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer . . . the initial burden rests primarily upon the employee . . . to suggest the reasonable accommodations.  It simply stands to reason that the employee and his health-care provider are best positioned to know what type of accommodation is appropriate for the employee.").

"[O]nce an accommodation is properly requested, the responsibility for fashioning a reasonable accommodation is shared between the employee and employer."  *Taylor*, 93 F.3d at 165 (5th Cir. 1996). "Thus, it is the employee's initial request for an accommodation [that] triggers the employer's obligation to participate in the interactive process of determining one.  If the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one."  *Id.; see also Schmidt v. Safeway, Inc.*, 864 F. Supp. 991, 997 (D. Oregon 1994) ("the employee can't expect the employer to read his mind and know he secretly wanted a particular accommodation and sue the employer for not providing it").

Hysom's failure-to-accommodate claims fail because she never specifically requested from DISD a reasonable accommodation of her disability.  Hysom admits that the only accommodation she ever requested was "time off" so she "could get [her] epilepsy under control." (DISD's App. (doc. 28) 31.)  But "a request for FMLA leave is not a request for a reasonable accommodation under the ADA."  *Id.* This is because "an employee who requests FMLA leave asserts he has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'"  *Id.* (citing 29 U.S.C. § 2612(a)(1)(D)). Whereas "[a] request for a reasonable accommodation under the ADA is a claim that the employee 'with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'"  *Id.* (citing 42 U.S.C. § 12111(8)).  "Thus, an employee seeking FMLA leave is by nature arguing that he *cannot* perform the functions of

the job, while an employee requesting a reasonable accommodation communicates that he *can* perform the essential functions of the job." *Id.*

Hysom contends in her brief that she "made multiple accommodation requests that were ignored *before* [she] was left with requesting medical leave through human resources." (Hysom's Br. (doc. 32) at 36.) Hysom fails to cite to any evidence, however, suggesting that she requested and was denied a specific accommodation of her disability from DISD personnel other than time off work. Rather, Hysom notes that she "met with Coffman regarding her fears she was at risk of losing her job due to her disability." (*Id.*) She does not indicate, however, that she requested a particular accommodation of her disability during that meeting. Hysom's brief also contends that Coffman "understood . . . Hysom was seeking an accommodation." (*Id.*) The evidence Hysom cites in support, however, belies this statement. Hysom cites both her deposition and Coffman's, but neither show that she requested a particular accommodation from Coffman or that Coffman understood her to be requesting an accommodation. (*Id.* (citing "Hysom Depo, Pl.'s Ex. 1 at App. 16 [84:10-14]; Coffman 30(b)(6) Depo, Pl's Ex. 4 at Appl. 040 [14:19-22]").)[2] Consequently, because Hysom failed to specifically request

---

[2]Hysom's deposition merely reflects that Coffman said "[n]ot to worry about it, that they would work with me and to take care of myself." (Hysom App. (doc. 33) 16.) And the cited lines of Coffman's deposition reflect only that Coffman was aware that Hysom had a seizure on August 11th after a staff-development meeting. (*Id.* at 40.) Neither deponent testifies that Hysom requested a particular accommodation of her disability from Coffman prior to seeking medical leave.

a reasonable accommodation from DISD, summary judgment in DISD's favor is appropriate on her failure-to-accommodate claims.

B.  Disability Discrimination

Hysom also contends that DISD discriminated against her on the basis of her disability when it terminated her.  To establish such a claim, "a  plaintiff must prove: (1) that he has a disability; (2) that he was qualified for the job; [and] (3) that he was subject to an  adverse  employment  decision  on  account  of  his  disability." *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014)(quoting *Zenor v. El Paso Healthcare Sys., Ltd*, 176 F.3d 847, 853 (5th Cir. 1999)).  DISD seeks summary judgment on this claim on the ground that Hysom was not a qualified individual with a disability.[3]

To be a qualified individual with a disability, a plaintiff must demonstrate that she could perform the essential functions of her job with or without accommodation.  42 U.S.C.A. § 12111 (8); *LHC Grp., Inc.*, 773 F.3d at 697.  "Regulations define essential functions as 'the fundamental job duties of the employment position the individual with a disability holds."  *Weber v. BNSF Ry. Co.*, 989 F.3d 320, 323 (5th Cir. 2021)(quoting 29 C.F.R. § 1630.2(n)(1)).  "A function is 'essential' if it bears 'more than a marginal relationship' to the

---

[3]Hysom must also satisfy this requirement for her failure-to-accommodate claims.  *See Weber v. BNSF Ry. Co.*, 989 F.3d 320, 323 (5th Cir. 2021) ("A failure-to-accommodate claim requires a showing that: '(1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations.'") (quoting *Credeur v. Louisiana*, 860 F.3d 785, 792 (5th Cir. 2017)).

employee's job."  *Id.* (quoting *Chandler v. City of Dallas*, 2 F.3d 1385, 1393 (5th Cir. 1993)).  In evaluating whether a job function is "essential,"  courts are to consider several factors, including the "[t]he employer's judgment as to which functions are essential" and "[w]ritten job descriptions prepared before advertising or interviewing applicants for the job." 29 C.F.R. 1630.2(n)(3) (2012).  "[T]here is a general consensus among courts . . . that regular work-site attendance is an essential function of most jobs."  *Weber*, 989 F.3d at 325.

Hysom has failed to demonstrate that she could perform the essential functions of her job as a special-education para-professional, with or without reasonable accommodation.  She admitted that her job required her to sit next to her students in the classroom and make sure they were listening and following directions.  (DISD's App. (doc. 28) 21.)  She also admitted that she was required to review her students' IEPs and implement them, including assisting with self-help and behavior management.  (*Id.* at 21-22.)  Indeed, a job-description list that Hysom signed prior to her employment indicates that her job duties included "intervening in crisis situations and re-directing disruptive or dangerous student behavior as needed." (*Id.* at 56.)

Additionally, Hysom was sometimes required to be "one on one in a classroom with a student" or "transport[] them from point A to point B."  (*Id.* at 61, 62.)  In the morning she had hallway duty, which meant she supervised students outside their classroom until their teacher arrived.  (*Id.*)  And she also helped with lunch duty,

which meant monitoring and assisting students during their lunch period. (*Id.* at 61-62.) Hysom was also sometimes responsible for a nonverbal student with a sun allergy who had to stay inside at recess, so she would stay alone with him inside the school and play games while the other students were at recess.  (*Id.* at 62-63.)

Obviously, regular attendance at the school is an essential function of DISD's special-needs paraprofessionals.  The most fundamental requirement of Hysom's position appears to have been regular presence.  Hysom's request for medical leave to deal with her epilepsy demonstrates that she was unable to perform the essential functions of her position.

DISD also notes that Hysom applied for social-security disability insurance ("SSDI") benefits only a few months before she commenced her position at Young, indicating on her application that although she had previously worked as a "Sped Aide", she was "unable to work." (DISD's App. (doc. 28) 175.)  Hysom's request for such benefits was apparently approved the day that she resigned from her employment at DISD, and she has been receiving disability benefits since then. (*Id.* at 18.)

An application for SSDI benefits is not necessarily inconsistent with pursuit of an ADA claim.  *See Cleveland v. Policy Mgt. Sys. Corp.*, 526 U.S. 795, 802-03 (1999).  Nevertheless, "a plaintiff's sworn assertion in an application for disability benefits that she is, for example, 'unable to work' will appear to negate an essential element of her ADA case [i.e., that with or without accommodation, she can perform the essential functions of her job]--at least if she

does not offer a sufficient explanation." *Id.* at 806.  Thus, "an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim.  Rather, she must proffer a sufficient explanation." *Id.*

Hysom fails to adequately explain her contention that, despite having sworn that she was unable to work in her application for social-security disability benefits submitted approximately three months prior to commencing her employment with DISD, she was nonetheless able to perform the essential functions of a special-education paraprofessional.  She fails to demonstrate that anything changed with her epilepsy during the intervening months between her application and the commencement of her employment that suddenly rendered her able to work.  Nor does she point to any reasonable accommodation of her disability that rendered her able to perform the essential functions of the position despite her epileptic seizures.  And it appears clear to the Court that a person prone to random epileptic seizures poses a danger to students if the seizure occurs while assisting a student one on one, individually transporting a student from one class to another class, or helping to control a disruptive or dangerous student.

## IV.  Conclusion

For the reasons stated herein, the Court concludes that Hysom has failed to demonstrate a genuine issue of material fact as to whether she requested a reasonable accommodation from DISD or whether she was a qualified individual with a disability.  Consequently, the

Court concludes that DISD's summary-judgment motion (doc. 26) should be, and it is hereby, GRANTED.

SIGNED April 3, 2023.

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE